Patrick C. Bageant (ISB No. 10291)
HOLLYSTONE LAW
1775 West State Street, No. 286
Boise, ID 83702
Telephone: 208-596-5343
Facsimile:  208-686-8247
Email:      pbageant@hollystonelaw.com

Thomas J. Lloyd III (ISB No. 7772)
GREENER BURKE SHOEMAKER OBERRECHT P.A.
950 W. Bannock Street, Suite 950
Boise, ID 83702
Telephone: 208-319-2600
Facsimile:  208-319-2601
Email:      tlloyd@greenerlaw.com

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOSEPH G. DAINES and SUSAN G. DAINES, a married couple, | Case No.: 1:18-cv-00170 |
| Plaintiffs, | |
| vs. | COMPLAINT |
| MARK MATSKO, an individual, and SELWAY ASSET MANAGEMENT, INC., an Idaho corporation, | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiffs, Dr. Joseph G. Daines and Susan G. Daines, by and through their undersigned attorneys, as and for their Complaint against Defendants, Mark Matsko and Selway Asset Management, Inc., allege and complain as follows:

## INTRODUCTION

1.     Defendants Mark Matsko and Selway Asset Management, Inc., are investment advisors whose poor judgment and incompetent advice has cost the Plaintiffs millions of dollars in retirement money.

2.     Specifically, the Defendants advised the Plaintiffs, a married couple, to place their retirement funds in an entity called the "Talon Fund," which Defendant Matsko then used to engage in speculative, gambling-style trading. Not only was this activity improperly disclosed to the Plaintiffs but – even had its risks been disclosed properly – it was utterly unsuitable for their financial needs.

3.     The 'investments' Defendant Matsko made with the Plaintiffs' retirement accounts may have been speculative, but their attendant risks were not: in February 2018 the Talon Fund, inside of which Defendant Matsko was using three quarters of the Plaintiffs' retirement assets to place leveraged bets on financial derivatives, imploded and lost all or substantially all of its value.

4.     The Defendants are liable to the Plaintiffs for those losses under 17 C.F.R. § 240.10b-5, promulgated under Section 10(b) of the Securities Exchange Act, and for, *inter alia*, breaches of their fiduciary duties (as registrants under the Investment Advisors Act of 1940 and entities subject to the United States Department of Labor's fiduciary rule), for breach of contract, and for violations of Idaho Code Section 30-14-501 & 502 and Idaho Administrative Rules 12.01.08.104.04 and 12.01.08.104.29.

## JURISDICTION AND VENUE

5.     This Court has original jurisdiction over the claims asserted herein and arising under federal law pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the claims asserted herein and arising under state law pursuant to 28 U.S.C. § 1367.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2), as the Defendants reside in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in Ada County, Idaho.

## PARTIES

7.      Plaintiffs Dr. Joseph Daines ("Dr. Daines") and Susan G. Daines ("Mrs. Daines") are a married couple who reside in, and at all times relevant to the events giving rise to this Complaint have resided in, Ada County, Idaho.

8.      Defendant Mark Matsko ("Matsko") is, on information and belief, an individual residing in Ada County, Idaho. Defendant Matsko is an investment adviser and is also the General Partner of the Talon Fund, L.P. ("Talon"). Talon is, on information and belief, a limited partnership organized under the laws of the State of Idaho, with its principal place of business located at 877 W. Main Street, Suite 602, Boise, Ada County, Idaho 83702.

9.      Defendant Selway Asset Management, Inc. ("Selway") is, on information and belief, a corporation organized under the laws of the State of Idaho, with its principal place of business located at 877 W. Main Street, Suite 602, Boise, Ada County, Idaho 83702. Defendant Matsko is the President of Defendant Selway.

## FACTUAL BACKGROUND

10.      Dr. Daines is a retired orthopedic surgeon who has treated patients the Boise area since the 1970s. Mrs. Daines has been married to Dr. Daines at all times relevant to the events described in this Complaint and has had a community property interest in Dr. Daines' earnings and retirement accounts.

11.      Over the course of Dr. Daines' successful career he saved money in tax-deferred accounts and ultimately accumulated approximately three million dollars for his and Mrs. Daines' retirement years.

12.      In connection with a pension plan associated with his medical practice, Dr. Daines received financial advising services from Burroughs Hutchinson, Inc., an investment advisory firm located in Boise, Idaho and subject to the Investment Advisers Act of 1940.

13.      In the late 1990s, Defendant Matsko, a financial advisor with Burroughs Hutchinson who is also subject to the Investment Advisers Act of 1940, began working with Dr. and Mrs. Daines with respect to their retirement and financial planning. In return for their services,

Defendant Matsko and Burroughs Hutchinson, Inc., took an annual management fee that (on information and belief) was measured as a percentage of the total value of the assets they managed for Plaintiffs.

14.     On August 19, 2013, Burroughs Hutchinson, Inc., filed Articles of Amendment with the Idaho Secretary of State, changing the name of the corporation to Selway Asset Management, Inc. and began doing business as Selway.

15.     Upon information and belief, Defendant Matsko has been the President of Burroughs Hutchinson and, later, Defendant Selway, at all times since October 2000.

16.     In or about 2001, Defendant Matsko also founded the Talon Fund, L.P. ("Talon"), and upon information and belief has acted as its General Partner since that time.

17.     At all times relevant hereto, Defendant Matsko was Talon's sole General Partner (either individually or through another entity, Talon Capital Management, which upon information and belief, if it ever actually existed, was solely controlled by Defendant Matsko). Defendant Selway (formerly known as Burroughs Hutchinson, Inc.) was Talon's investment adviser.

18.     As Talon's General Partner and controlling shareholder, and as President of Defendant Selway (which provided investment advice to Talon), Defendant Matsko had ultimate discretion and control over how Talon's assets were allocated. He received compensation from Talon in the form of management fees based primarily upon the amount of capital each limited partner/investor had invested in Talon at any given time. Defendant Matsko also earned performance-based fees according to how Talon performed for its Limited Partners.

19.     Between 2001 and 2009, upon information and belief, Talon did not file the required Annual Reports with the Idaho Secretary of State and was therefore administratively dissolved on or about June 8, 2007.

20.     Thereafter, Talon sought Reinstatement with the Idaho Secretary of State, and was reinstated on the records of the Idaho Secretary of State on September 21, 2009.

21.     Shortly after the Reinstatement of Talon by the Idaho Secretary of State, Defendant Matsko, acting in his role as the Plaintiffs' investment adviser, solicited the Plaintiffs to invest two hundred and fifty thousand dollars ($250,000) in Talon.

22.     On Defendant Matsko's advice and guidance, Plaintiffs completed and executed a "Confidential Investor Questionnaire for Individual Investors," identifying Dr. Daines as a "Subscriber" and Mrs. Daines as a "Co-Subscriber."

23.     Defendant Matsko filled out portions of the Confidential Investor Questionnaire, while other portions were left for Plaintiffs to complete.

24.     The Confidential Investor Questionnaire explained that "Subscribers are reminded that this investment is most appropriate for persons who prefer capital appreciation." In the Questionnaire, Defendant Matsko stated that Plaintiffs' investment objectives were, in order of priority, "Capital appreciation," then "Current income," and lastly "Liquidity." Although this order of priority was unsuitable and inaccurate for the Plaintiffs, given that they were on the brink of retirement after a successful medical career and that as retired individuals they would be relying heavily upon the liquidity of their retirement investments, Defendant Matsko neither advised the Plaintiffs of this issue nor provided them the opportunity to correct those inaccuracies. Rather, Plaintiffs relied upon Defendant Matsko's investment expertise as their investment adviser when he told them that Talon would be a good investment option for them.

25.     In the Confidential Investor Questionnaire that Plaintiffs completed in 2009, Plaintiffs identified that they had "Never" had any investments in "Other private investment funds, including hedge funds and commodity pools," which was significant because Talon was a hedge-fund style private placement with which Plaintiffs had no familiarity.

26.     When Defendant Matsko advised Plaintiffs to initially invest in Talon in 2009, he told Plaintiffs that their money would be safe in Talon and not subject to any greater risk than in a traditional IRA or similar investment portfolio.

27.     In conjunction with Defendant Matsko's advice to Plaintiffs to invest in Talon, Defendant Matsko (acting both in his capacity as Plaintiffs investment adviser and in his capacity

as General Partner of Talon) provided Plaintiffs with a "Confidential Offering Circular," which described the terms and conditions of the offering to invest in Talon.

28.     The Confidential Offering Circular specifically stated that Talon was only "suitable for persons who have substantial financial resources and can understand those risks."

29.     The Confidential Offering Circular further stated that "[e]ach investor [in Talon] must have funds adequate to meet personal needs and contingencies, must have no need for liquidity from the investment, and must purchase Interests for investment purposes only and not with a view to their sale or distribution."

30.     The Confidential Offering Circular further stated that "an investment in [Talon] is suitable only for sophisticated investors who have no need for liquidity in this investment."

31.     Defendant Matsko did not advise Plaintiffs that any funds invested in Talon would not be available for their normal retirement and living expenses, even upon their request.

32.     Because Plaintiffs did not have any experience in investments like Talon, Plaintiffs relied upon Defendant Matsko to explain all material aspects of the investment to them notwithstanding the Confidential Offering Circular, including the level of risk associated with Talon, the liquidity (or lack thereof) of the investments, and the level of discretion granted to Talon's General Partner (Defendant Matsko, himself) to make riskier and more speculative investments. Defendant Matsko, despite knowing that the Plaintiffs were relying on him, never adequately explained the Talon investment and, as a result, the Plaintiffs never fully understood the investment he had encouraged them to make.

33.     Defendant Matsko knew that Plaintiffs did not understand the risks associated with Talon, as they had no experience with alternative investments and were not sophisticated. Although Plaintiffs asked Defendant Matsko whether their money would be safe in Talon, Defendant Matsko responded simply that their money would be safe without disclosing the risks associated with Talon and Defendant Matsko's intended investment strategy.

34.     Defendant Matsko knew that Plaintiffs did not understand the Talon investment because, among other things, Dr. Daines repeatedly asked Defendant Matsko if he was exposed to

more risk than he should be bearing. Each time, Defendant Matsko assured Dr. Daines that the investment was a good one for him, and told him not to worry.

35.     Defendant Matsko was aware that, as time passed, Dr. Daines became increasingly worried that he did not understand the Talon investment because Dr. Daines became increasingly persistent in requesting that his funds be withdrawn or reallocated to other assets. Each time Dr. Daines made these requests, Defendant Matsko encouraged him to continue with his Talon investment, so that Defendant Matsko continued buying and selling high-risk securities with the Plaintiff's money.

36.     Defendant Matsko further knew that, as a married couple nearing retirement and the end of their working careers, Plaintiffs were on the cusp of having a substantial need for liquidity in their investments.

37.     Defendant Matsko further knew that Plaintiffs did not have additional and adequate funds to meet their personal needs through the end of retirement without liquidity in their retirement accounts.

38.     Despite Defendant Matsko's familiarity with the Plaintiffs' investment needs and their lack of investment sophistication, he nevertheless advised them to invest and remain invested in his fund, Talon, from which he would obtain additional fees beyond those he already received as their investment adviser.

39.     Plaintiffs' initial investment in Talon, of two hundred and fifty thousand ($250,000) post-tax dollars, occurred in or about October 2009. At all times relevant to Plaintiffs' initial investment in Talon, Defendant Matsko assured Plaintiffs that their investment in Talon did not bear any more risk than any other stock market investment and that their money would be safe.

40.     Dr. Daines retired in 2010. At the time of his retirement, he sought and received Defendant Matsko's advice as to how to manage his pre-tax retirement accounts during the retirement phase of his life. Dr. Daines expressed to Defendant Matsko that his primary objective was to sustain himself, and his wife, for the remainder of their lives.

41.    Defendant Matsko advised Plaintiffs to divide their retirement money into two substantially equal accounts and to invest each account differently. Specifically, Defendant Matsko advised Plaintiffs to invest the first account, which was to be the one from which Plaintiffs would draw money during retirement, in a portfolio of stocks. Defendant Matsko advised Plaintiffs to invest the account with the second half of his retirement money, an additional $1.7 million, into Talon. Neither of these allocations were suitable for Plaintiffs.

42.    When Defendant Matsko advised Plaintiffs to invest an additional $1.7 million into Talon in 2011, Defendant Matsko again failed to advise Plaintiffs that the appropriate subscriber investment objectives for Talon investors were focused on capital appreciation and not on current income and liquidity, such as would be suitable and appropriate for retirees like the Plaintiffs. Plaintiffs again trusted the advice of Defendant Matsko.

43.    When Defendant Matsko advised Plaintiff to invest additional funds in Talon in 2011, Plaintiffs did not have (and Defendant Matsko did not provide) any greater understanding of the risks associated with the investment, nor did Plaintiffs understand that their investment would not be liquid for use in their retirement. Rather, Plaintiffs trusted the advice of Defendant Matsko, who continually but falsely assured Plaintiffs that investment in Talon was safe, suitable, and advisable for their financial needs.

44.    At the time that Defendant Matsko advised Dr. Daines to initially invest in Talon in 2009, its assets were a portfolio of short and long stock, short and long options contracts, and a relatively small amount of cash.

45.    Talon's composition changed over time, however. In 2009, for example, Talon held approximately $36.6 million in assets, approximately 60% of which were allocated to stock. By 2012 Talon had grown to approximately $46.4 million in assets, approximately 49.3% of which were allocated to stock. In 2013 Talon's assets increased to approximately $47 million and the stock holdings represented 64% of Talon's assets; in 2014 Talon, now worth approximately $41 million, was allocated approximately 56.2 % to stocks, with the remainder of the assets being long and short options contracts, and cash.

46.     In 2015, however, the character of Talon's assets began a dramatic shift. Defendant Matsko reduced its stock holdings to approximately 34.7% of Talon's assets. The value of Talon also fell, to approximately $26.5 million. By December 2016, Talon held $28 million in assets, but only 13.9% of its assets were stock. The remaining holdings were options contracts and other leveraged financial instruments. By December 2017, Talon was allocated just 5.2 % to stock, and remainder of the its holdings were either derivatives contracts including options, other leveraged financial products with no underlying equity value, or cash. Further, Talon increasingly traded on margin.

47.     The flow of assets out of stock and into derivatives, and on margin, was a significant change. No longer did Talon have an underlying equity value: the right set of price moves in the financial markets could reduce the value of its holdings to zero. Furthermore, Talon's acquisition of leveraged financial products compounded that risk.

48.     The derivative trades that Talon was now dabbling in included products trading under the tickers SVXY and UVXY. SVXY seeks results (before fees and expenses) that correspond to one-half the inverse (-0.5x) of the performance of the S&P 500 VIX Short-Term Futures Index for a single day. SVXY seeks results (before fees and expenses) that correspond to one and one-half times (1.5x) of the performance of the S&P 500 VIX Short-Term Futures Index for a single day. Both products seek to offer exposure to market volatility – i.e., the amount of price change a security experiences over a given period of time – rather than equity.

49.     This therefore represented a significant departure from Talon's investing approach at the time Plaintiffs made their initial investments, which according to the Confidential Offering Circular were to involve only a "moderate degree of risk." Unlike stocks (which are priced based upon the present value of the expected future returns of an actual company with assets) and unlike options (which are contracts between investors to buy or sell blocks of a specific stock for a specific, fixed price in the future), Talon was now speculating on products designed to go up or down in value based upon how volatile the stock market is during a given time (e.g., if stock prices

fluctuate wildly these assets could implode in value; if stock prices remained steady, with only small moves in price, these assets could increase in value, or vice versa).

50.     These products – which are made out of math, not equity – are exotic. They serve specific and important functions in financial markets, primary among them being as a tool for hedging and for creating sophisticated transactions among commercial banks. Although there is no law prohibiting their sale to retail investors, they are speculative and exceedingly risky products to gamble on by simply holding long or short because, in part, profitable trading requires successful market timing.

51.     Indeed, in October 2017, the Financial Industry Regulatory Authority (FINRA) issued Regulatory Notice 17-32 to address the significant risks associated with VIX-based products such as those Talon was trading, labeling such products as "complex" products requiring "heightened scrutiny and supervision." Specifically, Regulatory Notice 17-32 addressed the heightened level of reasonable diligence required to determine and recommend that these products are suitable for certain investors. Suffice it to say, these products are not suitable for casual or unsophisticated retail investors, such as Plaintiffs.

52.     Furthermore, Talon essentially doubled down on its gambling bets in products like SVXY and UVXY by, rather than purchasing the securities, trading option contracts on them instead. The resulting 100-to-1 leverage made the value of Talon's assets subject to extreme deviation in a very short period time.

53.     That is exactly what happened in February 2018. In early February, the stock market dropped. The sudden change in stock prices – i.e., the increased volatility of those prices – caused the VIX to spike. And, when the VIX shot up, the volatility products Talon had been speculating in did what they were designed to do: they shot down.

54.     Talon's exposure to these products created a disaster; it suffered a leveraged deflation of the value of its assets so massive that Talon became worthless overnight. Plaintiffs lost approximately $2.5 million, which represented approximately three quarters of their retirement assets.

55.     To say this event took Plaintiffs by surprise would be an understatement. Dr. Daines is a physician, not a financial expert. He and his wife had hired Defendant Matsko, a fiduciary and financial advisor, to assist them with managing their assets in a fashion sufficient to sustain them through the remainder of their years. In other words, Plaintiffs hired Defendant Matsko because they trusted him to perform his fiduciary duties properly.

56.     Defendant Matsko and Defendant Selway breached that trust in manifold ways. To begin with, Talon was not a suitable investment for individuals in retirement. Furthermore, the changing character of Talon's investment approach (away from equity investment and toward speculative gambling on price moves) only exacerbated Talon's unsuitability. Each trade Defendant Matsko made inside Talon while Plaintiffs were invested was a purchase or sale of a security.

57.     Defendant Matsko's decision to invest Plaintiffs' retirement funds in Talon was not just unsuitable, however; it also was inherently conflicted and disloyal. Defendant Matsko took fees through Defendant Selway based upon the value of Plaintiffs' accounts with Defendant Selway, but then he took a second fee from the same accounts via his "management" of Talon. This conflict of interest should have been obvious to Defendant Matsko, but it was not disclosed to Plaintiffs.

58.     The disloyalty and conflicted interest also caused Defendant Matsko to avoid carrying out Plaintiffs' instructions with respect to their accounts. For example, between 2010 and 2016 the first half of Plaintiffs' retirement funds (those that had been allocated to stocks in 2010) were drawn down at a rate faster than Defendant Matsko should have advised given his knowledge of the illiquidity of the funds in Talon. The result was that the two "halves" of Plaintiffs' assets became unbalanced: by the end of 2017, the Plaintiffs' assets in Talon represented approximately $2.4 million, whereas their assets in the stock fund represented approximately $600,000.

59.     Plaintiffs therefore asked Defendant Matsko – repeatedly – to rebalance this allocation a number of times during 2015, 2016, and 2017. In response to each of these requests, Defendant Matsko either acknowledged that he would do so, or gave evasive answers about

Talon's performance and the benefits of staying invested there. Ultimately, Defendant Matsko never rebalanced Plaintiffs' accounts.

60.    This advice, which benefited Defendant Matsko in that he took a fee based on the value of assets in Talon, turn out to be devastating to Plaintiffs' retirement assets. When Talon imploded, Plaintiffs' security in and expectations for their retirement imploded with it.

### COUNT I: SECURITIES FRAUD
### SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934
### AND IDAHO CODE SECTIONS 30-14-501 & 502
### (SELWAY AND MATSKO)

61.    Plaintiffs incorporate paragraphs 1 through 60 as though set forth fully herein.

62.    Defendants made false statements and omissions of material fact to Plaintiffs including, but not limited to, statements that Talon was relatively low risk, that it was an appropriate vehicle for retirement funds, and that Defendant Selway and/or Defendant Matsko would redeem Plaintiffs' investment with reasonable notice.

63.    Defendants' false statements and omissions were made with scienter in that Defendant Matsko, who is a principal of Defendant Selway, was also the principal partner at Talon and made or supervised each of Talon's trades, and were made in direct contradiction of the information contained in the Confidential Offering Circular with a specific intent to mislead Plaintiffs into investing in Talon (IDAPA 12.01.08.104.29).

64.    Defendants' made their false statements and omissions in connection with the purchase or sale of securities, in that each trade Talon made between 2015 and February 2018 was the purchase or sale of a security, and that each statement or omission by the Defendants caused the Plaintiff keep money in Talon so that Defendants could use it to trade those securities.

65.    Plaintiffs justifiably relied upon Defendants' false statements and omissions, in that Plaintiffs' reliance upon Defendants' statements and advice was the very basis of their relationship: Defendant had contracted with Plaintiff to provide investment advisory services, and Plaintiffs' paid money to Defendants to do so.

66.     As a direct and proximate result of Defendants' false statements and omissions Plaintiffs have suffered actual and consequential damages for which they are entitled to recovery from Defendants. Because Defedants' false statements and omissions – including but not limited to false statements about the safety and stability of Talon, and omissions about Talon's change in character away from equities and toward high-risk, gambling style derivatives trades – caused Plaintiffs to consent to their money being used to purchase securities that lost all or substantially all of their value. Plaintiffs are also entitled to recover the compensation paid by them for the fraudulent investment advice provided by Defendants, pursuant to Idaho Code Section 30-14-509(f)(1).

67.     As a further direct and proximate result of Defendants' breaches of their fiduciary duties to Plaintiffs, Plaintiffs have been forced to retain legal representation to prosecute this matter and are therefore entitled to recover attorney fees in this action, pursuant to Idaho Code Sections 12-120(3), 12-121 and 30-14-509(f)(1).

### COUNT II: SUITABILITY
### SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934
### AND IDAHO CODE SECTIONS 30-14-501 & 502
### (SELWAY AND MATSKO)

68.     Plaintiffs incorporate paragraphs 1 through 67 as though set forth fully herein.

69.     Talon held securities that were unsuited to the Plaintiffs' needs in that the securities were volatile and prone to significant changes in value over a short period of time including, potentially, a sudden change to a value of zero. These features made Talon unsuitable for Plaintiffs, who are retirement-aged individuals requiring investment stability and liquidity, not unreasonable risk of loss of principal.

70.     Defendants knew, should have known, or should have reasonably believed the securities were unsuitable for Plaintiffs, because Defendants had personal knowledge of each investment Talong made, and because they hold themselves out to be investment advisors, and contracted with Plaintiffs for that purpose.

71.     Defendants recommended the unsuitable securities, nevertheless, despite having no reasonable grounds to believe that such a recommendation was suitable for Plaintiffs based upon Plaintiffs' known investment objectives, financial situation and needs, and other information known to Defendants (IDAPA 12.01.08.104.04).

72.     Defendants, with scienter, made material misrepresentations or failed to disclose material information relating to unsuitability. The omissions and false representations included, but are not limited to, statements that Talon was relatively low risk, that it was an appropriate vehicle for retirement funds, that Defendant Selway and/or Defendant Matsko would redeem Plaintiffs' investment with reasonable notice. Each of these statements were designed to encourage Plaintiffs to remain invested in Talon, so that Defendant Matsko could continue to trade securities with their money.

73.     Plaintiffs justifiably relied upon Defendants' false statements and omissions, in that Plaintiffs' reliance upon Defendants' statements and advice was the very basis of their relationship: Defendant had contracted with Plaintiff to provide investment advisory services, and Plaintiffs paid money to Defendants to do so.

74.     As a direct and proximate result of Defendants' conduct, including but not limited to the recommendation to invest and investment of Plaintiffs' retirement funds into unsuitable securities, Plaintiffs have suffered actual damages in an amount to be proven at trial for which they are entitled to recovery from Defendants.

## COUNT III: BREACH OF FIDUCIARY DUTY
## (SELWAY AND MATSKO)

75.     Plaintiffs incorporate paragraphs 1 through 74 as though set forth fully herein.

76.     Defendants owed the Plaintiffs a fiduciary duty because the Defendants are registered investment advisors under the Investment Advisers Act of 1940, and in fact contracted with the Plaintiffs to provide services pursuant to that Act. Furthermore, at the time Defendants were disloyal to Plaintiffs, made false statements, and failed to carry out instructions, as well as at the time Talon imploded, Defendants were subject to the United States Department of Labor's

fiduciary rule, which elevated all financial professionals who work with retirement plans or provide retirement planning advice to the level of a fiduciary, binding them legally and ethically standards of that status.

77.     Defendants breached their fiduciary duty by, among other things, failing to be candid about Talon's trades and the risk to which their recommendation to invest in it exposed the Plaintiffs, 'double-charging' of fees to the Plaintiffs by Defendants' actions of taking a fee on total assets under management and a separate fee on the same assets while they were invested in Talon, failing to supervise the Talon's investments with care, and failing to competently render investment advice suitable to the Plaintiffs at their station in life.

78.     As a direct and proximate result of Defendants' breaches of fiduciary duty, Plaintiffs have suffered damages in an amount to be proven at trial: had Defendants disclosed that Plaintiffs investments were at grave risk of complete loss of principal, that they were double-charging Plaintiffs, and that they were not adequately supervising Plaintiffs' funds with Plaintiffs' needs in mind, the Plaintiffs would not have allowed themselves to be exposed to either. Furthermore, had Defendants performed their advisory duties competently they never would have advised Plaintiffs to invest in Talon in the first place. Plaintiffs are entitled to recover damages from Defendants for Defendants' wrongful conduct.

79.     As a further direct and proximate result of Defendants' breaches of their fiduciary duties to Plaintiffs, Plaintiffs have been forced to retain legal representation to prosecute this matter and are therefore entitled to recover attorney fees in this action, pursuant to Idaho Code Sections 12-120(3) and 12-121.

### COUNT IV: BREACH OF CONTRACT
### (SELWAY)

80.     Plaintiffs incorporate paragraphs 1 through 79 as though set forth fully herein.

81.     Plaintiffs and Defendant Selway entered a contract whereby Defendant Selway was to provide investment advisory services to Plaintiffs, in return for annual fees.

82.     Defendant Selway owed the Plaintiffs a fiduciary duty in its performance of the contract because it is a registered investment advisor under the Investment Advisers Act of 1940. Furthermore, at all material times, Defendant Selway was also subject to the United States Department of Labor's fiduciary rule, which elevated all financial professionals who work with retirement plans or provide retirement planning advice to the level of a fiduciary, binding them legally and ethically standards of that status.

83.     Plaintiffs performed their obligations under the contract.

84.     Defendants Selway breached the contract by, among other things, failing to act as a fiduciary, failing to carry out Plaintiffs' instructions with respect to redemptions from Talon or rebalancing their accounts, failing to adequately explain Talon or how Plaintiffs money was being put to use within it, failing to disclose that it and Defendant Matsko were double-charging Plaintiffs on their funds within Talon, placing Plaintiffs in unsuitable investments, and making false or misleading statements and/or omissions under the guise of advice.

85.     As a direct and proximate result of Defendant Selway's breach of its contractual duties to Plaintiffs, Plaintiffs have been damaged in the form of the loss of their principal investment in Talon, lost opportunity cost measured by the value of that principal had it been allocated in a suitable fashion as the contract required, and loss of money improperly charged to them. Plaintiffs are entitled to recover damages from Defendants for Defendants' wrongful conduct.

86.     As a further direct and proximate result of Defendants' breaches of their contractual duties to Plaintiffs, Plaintiffs have been forced to retain legal representation to prosecute this matter and are therefore entitled to recover attorney fees in this action, pursuant to Idaho Code Sections 12-120(3) and 12-121.

## ATTORNEY FEES

Plaintiffs have been required to obtain the assistance of counsel in the prosecution of this matter. They are entitled to recover their reasonable costs and attorney fees pursuant to Idaho Code

Sections 12-120(3), 12-121 and 30-14-509(f)(1), and other applicable state and federal laws and rules.

## RESERVATION OF RIGHT TO AMEND COMPLAINT

In accordance with Federal Rule of Civil Procedure 15, Plaintiffs reserve the right to amend this Complaint as additional information is disclosed through the course of this litigation, including to add a claim for punitive damages for the oppressive, fraudulent, malicious and/or outrageous conduct of Defendants in the mishandling of Plaintiffs' retirement funds, according to the standards set forth under Idaho law, Idaho Code Section 6-1604.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiffs demand a jury trial on all issues so triable.

## PRAYER

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against the Defendants as follows:

1.   Awarding the Plaintiffs' actual and consequential damages under the Securities Exchange Act and the Idaho common law.

2.   Awarding general damages to the Plaintiffs in an amount to be determined at trial.

3.   Awarding treble damages to the Plaintiffs.

4.   Awarding to the Plaintiffs their costs and attorney fees.

5.   Awarding the Plaintiffs prejudgment interest on all liquidated sums;

6.   Granting the Plaintiffs such other and further relief, at law and in equity, as this Court deems just and proper.

Dated: April 17, 2018, by:


  /s/     Patrick C. Bageant              
Patrick C. Bageant (No. 10291)
HOLLYSTONE LAW
1775 West State Street, No. 286
Boise, ID 83702
Telephone:  208-596-5343
Facsimile:  208-686-8247
Email:       pbageant@hollystonelaw.com

*Attorneys for Plaintiffs*

  /s/     Thomas J. Lloyd III            
Thomas J. Lloyd III (ISB No. 7772)
GREENER BURKE SHOEMAKER
OBERRECHT P.A.
950 W. Bannock Street, Suite 950
Boise, ID 83702
Telephone:  208-319-2600
Facsimile:  208-319-2601
Email:       tlloyd@greenerlaw.com

*Attorneys for Plaintiffs*